Jogananda Hazra, pro se.

John McDonald and Lawrence Feheley, Columbus, for defendant.

---

**Jogananda HAZRA, Plaintiff,**

v.

**NATIONAL Rx SERVICES, INC., Defendant.**

**No. C2–89–551.**

United States District Court, S.D. Ohio, E.D.

Sept. 5, 1990.

OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This matter is before the Court upon the Defendant, National Rx Services, Inc.'s, Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. In response the Plaintiff, Jogananda Hazra ("Hazra"), has filed a "Motion to Deny Defendant's Motion for Summary Judgment". The defendant has since filed with the Court a Reply and a Supplemental Reply. This case was brought through a Complaint under Title 42 U.S.C. § 2000e–5(f)(1) for alleged unlawful employment practices based upon race and nationality, and discrimination based upon

age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*

## FACTS

The Defendant, Hazra, is originally from India and of the Asian Race. Furthermore, Hazra was born on May 30, 1935, and as such was over the age of 40 when the alleged cause of action arose. In this action, Hazra claims that National Rx unlawfully discriminated against him based upon his national origin, his race, and his age when they terminated his employment with them on October 30, 1987.

Hazra's employment began with a co-subsidiary of the defendant, National Pharmacies, Inc., in Elmwood Park, New Jersey, in April of 1983, when he was hired as a junior pharmacist. The Junior Pharmacist position was an unlicensed pharmacy position. Specifically, National Pharmacies, Inc. and Defendant National Rx Services, Inc. are subsidiaries of the same parent company. At the time of the plaintiff's hiring he was 47 years old, and thus already a member of the over 40 protected class. The plaintiff has admitted that he was not discriminated against because of his age, race or national origin at the time of his hiring in New Jersey. In February of 1984, Hazra voluntarily transferred from his position with National Pharmacies, Inc., to a job in Ohio with the defendant National Rx Services, Inc.

Defendant National Rx Services, Inc., operates a mail-service pharmacy in Columbus, Ohio. It is through this service that patient's prescriptions can be filled and provided to them through the mail. As is required by law, a licensed registered pharmacist must review, check and approve each prescription that is dispensed by the company.

After his transfer, Hazra registered as a pharmacy intern in order to become a licensed pharmacist. To become registered the intern must work under the supervision of a registered pharmacist, or "preceptor". The registered pharmacist or preceptor must agree to supervise the intern. National Rx agreed to act in this capacity on behalf of the plaintiff. In the plaintiff's deposition at page 37, Hazra affirmatively responded to the defendant's proposition that, "... if the company intended to discriminate against you because of your age, it hardly would have acted as your preceptor, would it?" At some point thereafter Hazra became a registered pharmacist.

On March 5, 1985, the defendant "hired" Hazra for the position of registered pharmacist. Hazra admits that there was no discrimination in the hiring of him for the position; which included a raise in pay. The position called for the plaintiff to take bottles off a conveyor belt and compare the already filled prescription with its label to determine if it had been properly filled. This job carried with it the standard responsibilities of any registered pharmacist licensed by the State of Ohio. Under Ohio law, Ohio Revised Code, Chapter 4729 and the Ohio Administrative Code, Chapter 4729-1, *et seq.*, each registered pharmacist is required to ensure that each drug that he or she dispenses to a patient is the same drug that the physician prescribed to the patient. According to the plaintiff's own deposition the registered pharmacist has the additional responsibility of ensuring that the label on the prescribed bottle correctly identifies the dispensed drug, and to this responsibility the pharmacist is held strictly accountable if the wrong drug, or the wrong strength of drug is prescribed to the patient.

It was allegedly pursuant to these stringent requirements that the company adopted a disciplinary policy for staff registered pharmacists who commit dispensing errors. These policies were instituted in the Spring of 1987. According to the Defendant, corrective action is taken whenever a staff registered pharmacist dispenses a prescription that results in the patient receiving the wrong drug, the wrong strength, the wrong dosage, or form of drug, or its equivalent generic form of the drug where the brand name drug was prescribed. National Rx contends that they review each situation independently and employ the following measures: counselling, warning, probation, and termination. The Company states as a general guideline

that under this policy, a staff registered pharmacist is warned and placed on probation if he or she commits three "significant" dispensing errors within a three month period. Examples of a "significant" dispensing error would be erroneously providing the patient with the wrong strength of drug, or the wrong drug all together. The policy further provides that any further dispensing error during the probationary period can result in termination. The defendant states that the policy was communicated to all of the pharmacists over a one month period at weekly meetings and that the policy was a "guideline" for disciplinary action, and would be applied on a case-by-case basis.

On May 12, 1987, Hazra dispensed a drug which was double the strength prescribed by the physician. Hazra's supervisor's met with him and discussed with him the importance of accuracy. The defendant also alleges that they informed Hazra to slow his pace if it would aid his accuracy.[1]

On June 26, 1987, Hazra was called upon to dispense a drug known as Depakote at a 250 milligram strength. Instead, the prescription was filled with 500 milligram tablets, double the strength of the actual prescription. Hazra's supervisors again met with him and again cautioned him to be more careful.

A few days later, Hazra was again reprimanded for erroneously dispensing a sublingual form of a drug (to be placed under the tongue of the patient) rather than the prescribed oral form of the drug (to be swallowed). The plaintiff acknowledged that this was his third error in two months, and that he could have been discharged for making the errors, ". . . if that's what they wanted." (See Hazra deposition at p. 80). Instead, the plaintiff was placed on probation and informed that any additional mistakes in the next 60 days would result in his termination.

Less than thirty days later the plaintiff committed an additional dispensing error. Hazra acknowledged that he could have been discharged for his latest mistake, however, he was instead permitted another chance. Hazra was placed on 90–days probation, and again he was informed that any additional errors would result in his termination.

In October of 1987, Hazra committed two additional dispensing errors defined as "serious" by the defendant. In both instances the plaintiff dispensed the wrong drug. Hazra acknowledged the errors by conceding that the medication that was sent to each patient was not the medication that had been prescribed. The defendant contends that based upon these six separated errors Hazra was terminated. This contention is not refuted by the plaintiff, and in fact the plaintiff recognizes his errors and does not dispute that these errors were the stated basis for his termination. Instead, the plaintiff bases his claim upon a statistical argument. The argument essentially follows the logic that he may have in fact committed the above-referenced errors, however, based upon the total number of prescriptions filled by him his error rate[2] was below that of the company's average for all pharmacists. The plaintiff obtained the Defendant National Rx's error rate from an article printed in the October 1987 issue of *U.S. Pharmacist* entitled "What Do Mail–Order Rxs Really Mean for Pharmacy?". Based upon the plaintiff's statistics he concludes that the defendant's must have discriminated against him based on either his age, race, nationality, or a combination of these factors because his error rate was below that of the company's average.[3]

---

1. At a later point the plaintiff contends that he was never advised to slow his pace to improve his accuracy. For purposes of the instant motion the factual discrepancy is of minimal relevance and certainly does not give rise to a genuine issue.

2. Presumably, the error rate is the number of errors per one hundred prescriptions filled.

3. This is due to his own calculation that his six errors amounted to an error rate of 0.0097, while either Medco Pharmacy or National Rx has held themselves out in the aforementioned article as having an error rate of 0.012. His argument is that since his error rate is below that of the company as a whole (the plaintiff presumes the 0.012 representation is a mean error rate of all pharmacists), the stated reason

## STANDARD OF REVIEW

In considering this motion, the Court is mindful that the standard for summary judgment "mirrors the standard for a directed verdict under [Rule 50(a)], which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) citing *Brady v. Southern Ry. Co.*, 320 U.S. 476, 479–480, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943). Thus, the Supreme Court concluded in *Anderson* that a judge considering a motion for summary judgment must "ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair minded jury could return a verdict for the plaintiff on the evidence presented." 477 U.S. at 252, 106 S.Ct. at 2512.

Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In essence, the inquiry is whether the evidence presented a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

Such an inquiry necessarily implicates the evidentiary standard of proof that would apply at the trial on the merits. As a result, the Court must view the evidence presented through the prism of the substantive evidentiary burden. Rule 56(e) therefore requires that the nonmoving party go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552.

In *Banks v. Rockwell International N. Am. Aircraft Operations*, 666 F.Supp. 1053 (S.D.Ohio 1987) (J. Graham), this district enunciated the importance of granting summary judgments in appropriate situations by stating that: "Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed to secure the just, speedy and inexpensive determination of every action." *citing, Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553, (quoting Fed.R.Civ.P. 1) *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

Thus, the mere existence of a scintilla of evidence in support of a plaintiff's claim is insufficient—there must be evidence upon which a jury could reasonably find for the plaintiff. Having discussed the Rule 56 standard of review, the Court now turns to the merits.

## ANALYSIS

The clearly enunciated rule in this circuit is that age discrimination cases are to be decided on a "case by case basis", utilizing the slightly modified version of the criteria set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Wanger v. G.A. Gray Company*, 872 F.2d 142 (6th Cir.1989). However, a mechanistic application of *McDonnell Douglas* has been explicitly discouraged. *Merkel v. Scovill, Inc.*, 787 F.2d 174, 177 (6th Cir.) (quoting *Sahadi v. Reynolds Chem.*, 636 F.2d 1116, 1118 n. 3 (6th Cir.1980) (per curiam)), *cert.*

for his termination, excessive errors, must be pretextual. However, the plaintiff has also admitted that he does not know whether the quoted "error rate" included both nonserious and

serious errors, or whether the rate was a mean or a median, or even the exact dates over which the information for the rate was calculated.

*denied,* 479 U.S. 990, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986); *Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66, 70 (6th Cir.1982).

The basic allocation of burdens and order of presentation of proof was first set forth by *McDonnell Douglas,* and later expounded upon by the Supreme Court in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1980), which provided as follows:

> In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' *Id.,* at 802, [93 S.Ct. at 1824]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. *Id.,* at 804 [93 S.Ct. at 1825.]

Therefore, the Court must first determine if the plaintiff has met the burden of establishing a prima facie case of discrimination.

In an age discrimination case, a discharged employee is called upon to present a prima facie case "by introducing evidence that he was adversely affected by the defendant's employment decisions 'under circumstances which give rise to an inference of unlawful discrimination.' " *Ridenour v. Lawson Co.,* 791 F.2d 52, 55 (6th Cir.1986) (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)); *see also Wanger v. G.A. Gray Co.,* 872 F.2d 142 (6th Cir.1989).

The Court was mindful to note in each decision that the burden of establishing a prima facie case of discrimination is not onerous. *Id.,* at 253, 101 S.Ct. at 1093–94. In *McDonnell Douglas,* the Court provided that the initial burden of showing a prima facie case of discrimination is done by demonstrating, by a preponderance of the evidence, the following:

> (i) that the plaintiff is a member of a protected class;

> (ii) that the plaintiff is qualified for the position and performed as required in the position;

> (iii) that despite the plaintiff's qualifications and performance, he was terminated; and

> (iv) that the defendant placed a person outside the protected class in the position or that other reasonable evidence exists for inferring that he was disparately treated.

*See generally Wilkins v. Eaton Corp.,* 790 F.2d 515, 520 (6th Cir.1986) (quoting *Ackerman,* 670 F.2d at 69); *Blackwell v. Sun Elec. Corp.,* 696 F.2d 1176, 1180–81 (6th Cir.1983); *Owens v. Freeman United Coal Mining,* 649 F.Supp. 1565, 1568 (S.D.Ill. 1986).

The Court finds that the plaintiff has failed to meet its initial burden of establishing a prima facie case of discrimination. In reviewing the four part test, it is not refuted that the plaintiff is a member of a protected class, however, there are serious questions as to whether the plaintiff's performance was what was expected of him in light of his numerous errors. The plaintiff admits the errors were made and to some extent admits that some of the errors were quite serious. His case instead attempts to focus not on his mistakes, but rather on the supposed rate of error for the entire company. However, the plaintiff has not offered this Court any evidence to place the quoted error rate found in the magazine article into context for use in this matter. Instead, the plaintiff wishes this Court to make a wholesale acceptance of the number quoted as being reliable, relevant, error-free, properly quoted, and in context, then use that number to draw a very serious inference of race, nationality or age

discrimination.[4] This is merely hypothecation and speculation that this Court will not enter into.

Based upon the pleadings, exhibits and depositions placed before the Court in this matter it becomes readily apparent that the defendant, National Rx, instituted a very strict policy in an attempt to rectify the problem or at least lower the error rate of prescriptions being filled. The policies appeared to be properly instituted. The Court has been provided no evidence upon which it could conclude that the defendant applied the policies disparately, therefore it must conclude that the policies were applied to all equally. By facts unrefuted by the plaintiff, he made three errors and was placed on probation pursuant to the policies. While under the probation an additional error was made, however, instead of being terminated the plaintiff was again warned and given an opportunity to correct the situation. Nonetheless, additional errors were made and the defendant was terminated. The plaintiff has admitted that he could not name another person who had more errors that had not been terminated, and he further admitted that the errors were the reason for his termination (See the deposition of Hazra at p. 105). Therefore, there appears to have been equal application of the policies as to all employees at National Rx.

Based upon the aforementioned reasons the Court finds that there is no question of material fact, and that the plaintiff has failed to make even a prima facie showing of discrimination, which is needed to prevail as matter of law. Furthermore, the Court finds that the plaintiff has failed to introduce evidence that he was adversely affected by the defendant's employment decision to terminate him, under circumstances which give rise to an inference of unlawful discrimination. Therefore, the defendant's motion for summary judgment is hereby GRANTED.

IT IS SO ORDERED.

---

4. In order for the rate of errors of National Rx, as quoted in the magazine article to become relevant in the instant case it would be necessary for the rate of error to be calculated based upon data accumulated after the policy had been in effect. Only then could the rate be relevantly compared to the rate of error of the plaintiff. Furthermore, the calculations performed by the plaintiff would have to be calculated in the same manner as the figure which was quoted in the magazine article. Also, the plaintiff's calculations and the information used to make the calculations would have to be proven to be correct. These, along with a myriad of other factors would need to be evidenced before the numbers the plaintiff relies upon would become relevant. However, assuming, *arguendo*, the figures used by the plaintiff in his argument were correct, relevant, etc., and the defendant's logic is followed,—that logic being that since the rate of errors was higher for the company as a whole than was his personal rate of errors, then the company must have terminated him based upon discrimination—at the very least the plaintiff should be able to point to at least one example where an individual that had a worse error rate had not been terminated, presumably because he or she was under forty or American. Instead, the plaintiff is unable to show a single deviation from the set standard of the instituted policy.